## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DIANA ROESINGER,** | * | |
| **Plaintiff,** | * | |
| v. | * | **Civil Action No. RDB-20-2439** |
| **POHANKA OF SALISBURY, INC.,** | * | |
| **Defendant.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### MEMORANDUM OPINION

Plaintiff Diana Roesinger ("Roesinger" or "Plaintiff") brings this action against her former employer Defendant Pohanka of Salisbury, Inc. ("Pohanka" or "Defendant"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-606. (ECF No. 1.)  The undisputed record in this case indicates that Roesinger started her employment as an apprentice express car technician at Pohanka in April 2017 when she was nineteen years old.  At her request, in October 2018 her status was changed so that she would be paid on an adjusted "flat rate" system normally applied to far more experienced technicians. As a result of Roesinger's resulting employment difficulties, she met with her supervisor on November 1, 2019 but left the meeting despite being advised not to do so.  She was accordingly terminated.

Roesinger now claims that she was terminated from her position at Pohanka's Toyota dealership in retaliation for certain complaints she made to management regarding sex discrimination she was allegedly experiencing at the dealership.  (*Id.*)  She also makes two

claims of sex discrimination on the basis of hostile work environment and wrongful termination. (*Id.*) Currently pending is the Defendant Pohanka's Motion for Summary Judgment (ECF No. 17). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). Roesinger's claims are factually unsupported and the evidence proffered not significantly probative. Accordingly, for the reasons that follow, Defendant Pohanka's Motion for Summary Judgment (ECF No. 17) is GRANTED, and Summary Judgment shall be ENTERED in favor of Defendant Pohanka.

## BACKGROUND

In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). Plaintiff Roesinger began working as a service technician for Defendant Pohanka at its Toyota dealership in April of 2017 when she was nineteen years old. (Roesinger Dep. at 10:18-11:8. ECF No. 22-3; Roesinger Decl. ¶ 2, ECF No. 22-4.) Defendant Pohanka owns and operates several car dealerships around the Salisbury, Maryland area, including the Toyota dealership where Roesinger was employed. (Roesinger Decl. ¶ 3, ECF No. 22-4.)

According to Roesinger, when she was hired, she was the only female technician employed at the Toyota dealership and was one of only two female technicians employed between all Pohanka dealerships. (Bowen Dep. at 19:16-18, ECF No. 22-5; ECF No. 22-6.) She alleges that from the outset, the male service technicians at the Toyota dealership, as well her direct supervisor Tyler Burrs, refused to interact with her, intentionally passed her over for service tickets, and closely scrutinized her work. (Roesinger Dep. at 32:19-33:2, ECF No.

22-3; Roesinger Decl. ¶ 5, ECF No. 22-4.)  She now asserts in this lawsuit that such conduct was the result of sex discrimination.  Her Complaint generally alleges that she was passed over for higher paying repair jobs; made substantially less money than her male coworkers; and that male coworkers "defaced" the women's restroom.  (ECF No. 1 ¶ 33.)  She further asserts that upon reporting such concerns, she was terminated.  (*Id.* ¶¶ 68-69.)

When Roesinger began working at the Toyota dealership in 2017, she was an hourly technician responsible for tasks such as cleaning the shop and completing oil changes. (Bradley Decl. ¶ 2, ECF No. 17 at 27.)  In addition to working as an hourly technician, Roesinger attended two classes a week offered by Pohanka for instruction on how to complete automotive repairs.  (Roesinger Decl. ¶ 6, ECF No. 22-4; *see also* White Decl. ¶ 2, ECF No. 17 at 18.)  The classes were taught by Robert David White, an independent contractor with more than thirty years of experience as an automotive technology teacher for the local public-school system and more than 20 years' experience working as an instructor at a community college. (White Dep. at 7:10-20, ECF No. 22-8; White Decl. ¶ 1, ECF No. 17 at 18.)  White asserts that it was "very apparent" to him that Roesinger "had no experience whatsoever" and "had absolutely no knowledge of skills related to automotive repair."  (White Dep. at 16:13-15, ECF No. 22-8; White Decl. ¶ 3, ECF No. 17 at 18.)  White claims that "[a]s a result of her inexperience, Ms. Roesinger found it very difficult to achieve success at a rate that satisfied her."  (White Decl. ¶ 5, ECF No. 17 at 18.)  He notes that she had a "strong desire to work as a technician," but that her lack of experience "probably stood in her way more than anything else."  (White Dep. at 16:15-22, ECF No. 22-8.)  White asserts that on numerous occasions

he told Roesinger "that the knowledge required to be a successful technician required several years of work and experience." (White Decl. ¶ 5, ECF No. 17 at 18.)

White recalls that for about three months, "things went fairly well with Ms. Roesinger in class" but that "[a]s the material got to be more complicated, . . . other students seemed to be grasping and understanding the content quicker." (*Id.* ¶ 6.) He noticed that Roesinger became less talkative in class and appeared depressed. (*Id.*) According to White, she indicated to him that she was dealing with various personal and health issues. (White Dep. at 17:1-12, ECF No. 22-8.) She also allegedly "indicated that she felt some of the other people there at the location didn't care for her" and that "she wasn't being treated fairly." (*Id.* at 17:14-17.) According to White, however, she never indicated that she thought she was having problems with others at work as a result of sexism. (*Id.* at 17:20-18:2.) A few weeks after White noticed Roesinger was having difficulties in class, she also allegedly complained to him about mistreatment by her service manager, Tom Chilcoate. (White Decl. ¶ 7, ECF No. 17 at 19.) Her complaints were that Chilcoate did not like her and was critical of her work. (*Id.*)

In June 2018, a little over a year after she began working for Pohanka, Chilcoate rated Roesinger as "outstanding" and increased her hourly rate by seventy-five cents. (ECF No. 22-9.) However, sometime around October 2018, at her request, Roesinger transitioned from being paid as an hourly technician to payment as a technician under a "flat" or "flag" rate system. (Roesinger Decl. ¶ 8, ECF No. 22-4.) Under the flat/flag pay system, there is a pre-designated amount of time that a repair should take when performed under normal circumstances, referred to as the "flag time." (*Id.*) The amount paid to the technician for a job is the flag time multiplied by the technician's established pay rate. (*Id.*) According to

Chilcoate and White, Roesinger requested to shift from hourly pay to the flat-rate system because she desired to make more money. (Chilcoate Decl. ¶ 2, ECF No. 17 at 16; White Decl. ¶ 9, ECF No. 17 at 19.) Both individuals advised Roesinger against making this change. (*Id.*) As Chilcoate explains, a flat rate system only benefits those individuals with a certain level of skill and experience: "An employee who is experienced and can quickly and successfully complete complex jobs generally does well on flat rate. An entry level employee, like Ms. Roesinger, simply does not have the capabilities to do well earning a flat rate, and would do much better as an hourly employee." (Chilcoate Decl. ¶ 2, ECF No. 17 at 16.) White similarly states that he advised against the move "because she did not have the necessary experience to make the flat-rate pay plan work to her benefit." (White Decl. ¶ 9, ECF No. 17 at 19.)

Despite White and Chilcoate's warnings, Roesinger moved to flat rate pay. Upon this transition, Roesinger cut back on her classes with White, attending only intermittently. (*Id.* ¶ 10.) Chilcoate recalls that with the change, he began to notice "many problems with her work product." (Chilcoate Decl. ¶ 4, ECF No. 17 at 16.) According to Chilcoate, he had to have other employees help Roesinger complete certain jobs and fix her mistakes and that much of the work she did complete would "come back" and have to be repaired by a different technician. (*Id.*) Chilcoate further asserts that he told Roesinger that if she was having trouble with any particular job, she should stop working, come to him for help, and he or someone else would assist her. (*Id.* ¶ 6.) However, she allegedly continued to break things or do work incorrectly, and when he tried to address these issues with her, she would either leave or state that she had to go "throw up." (*Id.*) Chilcoate also states that when customers would complain

or return with problems after Roesinger's repairs, "she would break down, or sit in the middle of the floor at work and cry, or go away and hide in strange places, like in cabinets or under desks, or just leave."  (*Id.* ¶ 5.)  He found trying to help Roesinger to be "very frustrating" because "[s]he genuinely did not seem to want" others' help.  (*Id.* ¶ 7.)

Lindsay Naill, an employee at Pohanka states that Roesinger "was difficult to work with," "regularly had trouble doing her job," and "often broke parts of customers['] cars." (Naill Decl. ¶ 7, ECF No. 17 at 16.)  She also asserts that "[o]n many occasions, Ms. Roesinger would throw fits and walk around yelling, crying, and these episodes would often end with her sitting in the middle of the workplace floor, causing a scene."  (*Id.* ¶ 8.)  She states that Roesinger had "altercations" with other technicians almost every day.  (*Id.* ¶ 9.)  Niall also asserts that Roesinger would refuse to do maintenance services on a vehicle if she thought there was another ticket that could make her more money.  (*Id.* ¶ 10.)  She specifically notes one occasion when Roesinger left for an hour in the middle of an oil pan reseal while the customer was waiting at the dealership for the repair to be completed.  (*Id.*)  Niall asserts that upon her return Roesinger "cursed and yelled" at her.  (*Id.*)

Technicians working alongside Roesinger have made similar complaints.  David Ennis was another technician at Pohanka.  (Ennis Decl. ¶ 1, ECF No. 17 at 1.)  Ennis asserts that on numerous occasions, he was asked by Chilcoate to assist Roesinger when she broke parts or was unable to perform certain repairs.  (*Id.* ¶ 2.)  According to Ennis, Roesinger generally engaged in "very-out-of-the ordinary behavior" at work, "including crying and leaving work to go home."  (*Id.* ¶ 4.)  Another technician, Randall McGeehan, who worked at the bay next to Roesinger, asserts that he "tried to help her" but that to him she seemed "un-coachable."

(McGeehan Decl. ¶ 1, ECF No. 17 at 22.)  He reports that "[s]he would not acknowledge or accept responsibility for her mistakes, nor did she take advantage of resources available online, which could have helped her with repairs."  (*Id.*)  McGeehan asserts that he did not want to upset Roesinger because she would cry and run away or hide; that Roesinger caused problems with her co-workers around her work-area because of her attitude and mannerisms; and that she would only ask for help after she broke things.  (*Id.* ¶¶ 3-4.)  Donald Ebersole, a technician that has been with Pohanka since 2000, states that although he did not interact with Roesinger often, he was at times "needed to step in and finish or tweak" repairs made by Roesinger in order to "complete the job and get the vehicle back to the customer."  (Ebersole Decl. ¶ 2, ECF No. 17 at 25.)  He believes that Roesinger was "unskilled and often blamed others for her troubles."  (*Id.* ¶ 3.)  He also notes that he had observed her "regularly during her 'meltdowns,' which included crying and hiding behind toolboxes when she was upset."  (*Id.* ¶ 4.)

Two of Pohanka's "Master Technicians" had similar concerns.  Timothy Morton, a Master Diagnostic Technician at Pohanka since 2012, asserts Roesinger tended to act irrationally with others around her.  (Morton Decl. ¶ 2, ECF No. 17 at 26.)  For example, he recalled one occasion when he noticed she was not completing a repair correctly and she asked him for help, but when he did attempt to help and began questioning the way she had gone about the repair, she "became defensive and yelled at [him]."  (*Id.* ¶ 3.)  Jason Bradley, a Master Technician since June 2014, recalls an occasion where she "berate[d]" him when he suggested she have a conversation about her issues with another technician.  (Bradley Decl. ¶ 3, ECF No. 17 at 27.)  He also contends that Roesinger "believed she was more equipped to do jobs

in some cases than [the] master technicians." (*Id.* ¶ 7.)  Based on Bradley's observations, "[that] belief was unfounded."  (*Id.*)

Service writers at Pohanka had their own concerns.  Service writers are responsible for identifying customer complaints, providing "write-ups" for customers, and working with technicians to find the cause of a problem in order to communicate the necessary correction to the customer.  (Foreman Decl. ¶ 1, ECF No. 17 at 23.)  According to Destiny Foreman, a service writer since February 2017, Roesinger would not follow the ordinary process for dealing with customers, seeking to speak with them directly, rather than through the service writers.  (*Id.* ¶ 2.)  When Foreman told her she could not contact customers directly, Roesinger would "often sit in the middle of the floor and cry" or sometimes would "hide and disappear." (*Id.*)  Melissa Williams, another service writer with the company, explains that technicians would be assigned work based upon their qualifications and skill levels, and that the goal of the Service Department was to match jobs to technicians with the necessary skill-sets, as well as to rotate jobs so that everyone would have work to do.  (Williams Decl. ¶ 2, ECF No. 17 at 24.)  According to Williams, Roesinger acted like "everyone was 'out to get her' and would try to blame everyone but herself for her mistakes."  (*Id.* ¶ 3.)  She recalls that Roesinger often broke parts and that she would then ask Williams to "upsell" the job, passing along the extra expense to the customer.  (*Id.* ¶ 4.)  Williams states that such a practice was against Pohanka's policy and asserts that when she tried to address such issues with Roesinger, she would become upset and hide or leave the premises altogether.  (*Id.* ¶ 4.)

At some point after Roesinger's transition to flat rate pay, Roesinger approached Chilcoate with concerns about Tyler Burrs, Roesinger's direct supervisor.  (Roesinger Dep. at

8

49:4-13, ECF No. 22-3.)   According to Roesinger, Burrs was responsible for handing out service tickets and skipped Roesinger when it was her turn and a repair involved a vehicle with more miles or more complicated repairs.  (Roesinger Decl. ¶ 9, ECF No. 22-4.)  Burrs would "go outside the rotation" to give Roesinger less complicated tasks such as servicing vehicles with less than 10,000 miles, oil changes, and tire rotations—jobs with low flag times and which paid less money.  (*Id.* ¶ 10.)  She reports that when she asked Burrs why she was being passed over for tickets, he allegedly responded "because you fuck shit up."  (Roesinger Dep. at 15:18-16:13, ECF No. 22-3.)

Roesinger concedes that she did make mistakes, but she contends that they were "nothing major" and that "everyone" made mistakes.  (*Id.* at 66:4-5.)  For example, she notes that another technician, CJ Coffin, left a drain plug out of an engine when he did an oil change and had to pay out of pocket to put a new engine in the car.  (*Id.* at 66:5-11.)  She also notes that Alex Singh "repeatedly" struggled with tire pressure sensors and "had all kinds of reoccurring issues."  (*Id.* at 31:15-17.)  Coffin and Singh also attended his classes with White. (White Dep. at 25:19-26:20, ECF No. 22-8.)   According to White, Singh started working around the same time as Roesinger, but he remained an hourly employee.  (*Id.* at 26:3-4.) White observed Singh helping Roesinger on several occasions, and he noted that Singh had the flexibility to stop his own work and help Roesinger because he had remained on the hourly pay system.  (*Id.* at 25:19-26:6.)  Coffin, according to White, was a more experienced technician who took classes with White as "refreshers" and to prepare for certain certification tests.  (*Id.* at 27:1-6.)

Roesinger reports that the "perpetual discrimination and harassment" that she suffered
at Pohanka exacerbated her anxiety, depression, and post-traumatic stress disorder, which she
had struggled with since childhood. (Roesinger Decl. ¶ 13, ECF No. 22-4.)  Roesinger alleges
that she told Chilcoate about problems regarding her male coworkers' use of the women's
restroom. (*Id.* ¶ 17.) According to Roesinger, men began leaving feces inside and outside the
toilet and storing drug paraphernalia in the restroom. (*Id.*)  She asserts that she placed a sign
on the door stating that unless individuals identified as a woman, they should not use the
restroom. (*Id.*)  She alleges that someone blacked out "wo" in "woman." (*Id.*)  In response to
Roesinger's concerns, Chilcoate locked the women's bathroom and kept the key in his office
where Roesinger could access it whenever she wanted to use the restroom. (*Id.*)

Dissatisfied with Chilcoate's response to her concerns, Roesinger decided to contact
Megan Fitzgerald, the daughter of Pohanka's owner and the Director of Digital Media. (*Id.* ¶
18.) On September 18, 2019, Roesinger texted Fitzgerald and stated:

> Well I've been working here for roughly 2 and a half years . . . I started out as
> an hourly technician and worked my way up to flat rate . . . but I'm not being
> treated fairly and I'm frustrated . . . I've tried to talk to Tom [Chilcoate] and
> Tyler [Burrs] about it but it doesn't ever get anywhere.  There's a lot of
> favoritism and shady dealings that go on in the shop . . . all I want to do is work
> but they make it impossible sometimes . . . I don't feel comfortable always
> either . . .

(ECF No. 22-17.)  Her text message did not state she felt that she was being treated unfairly
because she was a woman.  Fitzgerald responded, suggesting that Roesinger speak directly with
Wayne Bowen, who had stepped in for Chilcoate after he took a leave of absence from work
starting September 13, 2019. (*Id.*; Chilcoate Dep. at 23:10-18, ECF No. 22-18.)  Bowen recalls

that he heard from Fitzgerald that Roesinger had come to her with concerns about being treated fairly.  (Bowen Dep. at 12:20-12:18, ECF No. 22-5.)

Roesinger then met with Bowen, as well as Herb Williams, Pohanka's Parts Director.  (*Id.*)  Roesinger alleges that she brought with her a handwritten list of examples of gender-based mistreatment.  (Roesinger Decl. ¶ 20, ECF No. 22-4.)  She allegedly reported that she had been denied certain training opportunities, repeated allegations with respect to the defacing of the women's restroom, and asserted that when she tried to address these issues with her male counterparts, they would respond saying things like she was "acting like a cunt."  (*Id.*)  She also made complaints that she was being passed over for tickets by Burrs.  (Roesinger Dep. at 38:8-9, ECF No. 22-3.)  Bowen disputes that Roesinger made it clear that her concerns were related to allegations of sexism.  (Bowen Dep. at 12:19-22, ECF No. 22-5.)  Nevertheless, he took action to address what he believed to be her main concern—that she was not being treated fairly with respect to work distribution.  (*Id.* at 13: 14-18.)

First, Bowen suggested that Burrs be brought into the meeting so that they could have a conversation about Roesinger's concerns related to being passed over for tickets.  (Roesinger Dep. at 38:19-39:3, ECF No. 22-3.)   According to Roesinger, Burrs denied intentionally skipping her for work and "gave a number of excuses" as to why he would break rotation to give or not give her certain jobs.  (Roesinger Decl. ¶ 23, ECF No. 22-4.)  Bowen asserts that after the meeting he "called the shop together" and told them that if they were picking on Roesinger, they needed to stop.  (Bowen Dep. at 17:4-7, ECF No. 22-5.)  He also asserts that he then later followed up with Roesinger and told her that he thought that they "could get through this."  (*Id.* at 19:1-9.)  Roesinger acknowledges that Bowen told her that if there were

areas of repair work she was not comfortable with, Pohanka could have White provide her further instruction in private classes. (Roesinger Dep. at 40:8-14, ECF No. 22-3.) Bowen also claims that he had a follow up with Burrs, asking him, "Hey are we treating [Roesinger] fairly? Make sure we are." (*Id.* at 19:10-12.)

Roesinger alleges that following the meeting with Bowen and Burrs, Burrs told all of their co-workers that Roesinger had "called him out" for discrimination and called her a "cunt," and that Bowen did nothing to discipline him for such conduct. (Roesinger Dep. at 39:16-42:3, ECF No. 22-3.) A few days later, Roesinger decided to again reach out to Fitzgerald about her concerns. On September 24, 2019 she told Fitzgerald that "Tyler [Burrs] [was] still playing favorites," providing an example: that morning another technician had his name on the list before hers, but Burrs gave Roesinger the next ticket, allowing the other technician to wait for a better paying one. (ECF No. 22-17.) Fitzgerald responded, stating:

> Is everyone equally certified/qualified? I worked in service for a long time years ago as an advisor but back then I was also the dispatcher, the cashier, etc. [ ] We didn't have all those things . . . . Back the[n] different techs had different "capability" levels, for lack of a better term. Is it still that way? There were only so many items we were able to truly "round robin" out. Certain diag jobs, electrical, even bigger ticket "maintenance" jobs like timing belts were given to the higher level certified technicians. In the same token, the [oil change and tire rotation jobs] typically weren't given to those techs because they were often tied up with the bigger jobs that were sometimes more time consuming. Is it still that way?

(*Id.*) Roesinger conceded that this was true to some extent but asserted that the jobs at issue that morning did not require certifications. (*Id.*) She also noted that although she had completed all the required courses, she had still not been sent by the company to the "Toyota School" where she could gain other certifications. (*Id.*) Fitzgerald did not respond to Roesinger's last text. (*Id.*)

On November 1, 2019, Coffin was filling in for Burrs and was handing out service tickets. (Roesinger Dep. at 53:13-14, ECF No. 22-3.)  According to Roesinger, Coffin tried to give a ticket for an oil change and tire rotation on a low mileage car to Ennis. (*Id.* at 55:15-55:20; Roesinger Decl. ¶ 28, ECF No. 22-4.)  Roesinger alleges that Ennis refused the ticket because it was a low-paying job. (Roesinger Decl. ¶ 28, ECF No. 22-4.)  Ennis agrees that he refused the ticket that morning, but he asserts that he refused it because he was stuck on another job. (Ennis Decl. ¶ 3, ECF No. 17 at 21.)  Coffin proceeded to give the ticket to Roesinger. (Roesinger Decl. ¶ 28, ECF No. 22-4.)  According to Roesinger, she questioned Coffin about why she was given the ticket since Ennis was before her in line that day, and that when Coffin told her to "just do it," she placed the ticket on a desk and went to speak with another coworker about the situation. (Roesinger Dep. at 53:14-22, ECF No 22-3.)

Meanwhile, Coffin went to Bowen and allegedly "falsely reported" that Roesinger had refused the low-paying ticket. (Roesinger Decl. ¶ 29, ECF No. 22-4.)  At that point, Bowen asked to speak with Roesinger. (*Id.*)  According to Roesinger, Bowen proceeded to yell at her, telling her she was being a problem. (Roesinger Dep. at 55:4-11, ECF No. 22-3.)  She alleges that she began to feel "really uncomfortable," that she communicated her discomfort to Bowen, and that she told him she would like to go talk to her boyfriend and then come back once they had both clamed down. (*Id.* at 55:13-56:9.)  Roesinger alleges that Bowen told her to "sit the fuck down" and stated that if she did not sit down, she would be fired. (*Id.* at 55:16-18, 56:15-22.)  Bowen disputes whether he did in fact use the word "fuck" in telling her to sit down, but he admits that he did tell her that if she did not stay and speak with him, she would be fired. (Bowen Dep. at 35:19-22, ECF No. 22-5.)  According to Niall, who asserts she was

sitting at her desk outside of Bowen's office, Bowen did not raise his voice or use any inappropriate language.  (Niall Decl. ¶ 4, ECF No. 17 at 14.)  Niall also claims that Bowen told Roesinger that she needed to sit down so that they could address her issues, but that Roesinger did not sit down and left the building and did not return.  (*Id.* ¶¶ 5-6.)

Thirty minutes after leaving Pohanka, Roesinger texted Fitzgerald, claiming she had been unfairly fired, stating that she thought it had a lot to do with the fact she was "female and autistic."  (ECF No. 22-17.)  Three days later, Bowen completed the termination paperwork. (ECF No. 22-21.)  His report states that Roesinger was asked to come to his office about a work issues, but that she made excuses and refused to sit down.  (*Id.*)  The report also states that Roesinger said she was going to call her boyfriend; that Bowen told her that if she walked out she would be fired; and that she responded that she did not care and walked out. (*Id.*)  Bowen marked the box "insubordination" as the reason for her dismissal.  (*Id.*)

Roesinger filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").  On June 12, 2020, the EEOC notified Roesinger that it was terminating its processing of her charge and that, accordingly, she had a right to bring her case in federal or state court within ninety days of the notice.  (Exh. A, ECF No. 1-1.) Roesinger then filed this suit against Defendant Pohanka on August 25, 2020.  (ECF No. 1.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."

14

*Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.   When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.   *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.   *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).   This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility.   *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial.   *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).   If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted.   *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633

(4th Cir. 1999).  As this Court has previously explained, a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## ANALYSIS

Plaintiff Roesinger alleges various claims against Pohanka under Title VII of the Civil Rights Act of 1964 ("Title VII"), as well as the Maryland Fair Employment Practice Act ("MFEPA").  Title VII generally prohibits an employer from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.  When a plaintiff asserts a claim for discrimination under Title VII, that plaintiff may avert summary judgment and establish a claim of intentional discrimination using "ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue." *EEOC v. Western Elec. Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir. 1983).  Alternatively, a plaintiff may proceed under the proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny, under which the employee, after establishing a *prima facie* case of discrimination, must demonstrate that the employer's proffered nondiscriminatory reason for the challenged employment action is in fact a pretext for discrimination.  *Id.*

The Maryland Fair Employment Practices Act ("MFEPA") is "the State law analogue to the federal employment discrimination statutes."  *See Ensor v. Jenkins*, No. ELH-20-1266, 2021 WL 1139760, at *18 (D. Md. Mar. 25, 2021).  "Maryland courts 'traditionally seek guidance from federal cases in interpreting [it].'"  *Id.* (quoting *Eubanks v. Mercy Med. Ctr., Inc.*, WDQ-15-512, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015) (citing *Haas v. Lockheed Martin*

*Corp.*, 914 A.2d 735, 742 (Md. 2007)).  Accordingly, MFEPA adopts the same substantive standards and burden of proof as Title VII.  *Limes v. American Fed'n of State Cnty. & Mun. Emps. Union (Local 2250)*, No. PX-19-03225, 2020 WL 1914806 at *2 (citing *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 498 n.2 (D. Md. 2019)).  This Court will generally analyze Roesinger's MFEPA claims under the relevant Title VII standards.

## I.      Retaliation (Count I)

In Count I, Roesinger alleges retaliation under Title VII and MFEPA.  Title VII provides that an employer may not discriminate against an employee who "has opposed any . . . unlawful employment practice" covered by the statute. 42 U.S.C. § 2000e-3(a).  To state a *prima facie* claim of retaliation under Title VII, a plaintiff must prove that (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the activity and the adverse action.  *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997); *McGrath-Malott v. Maryland*, 565 F. Supp. 2d 656, 670 (D. Md. 2008).  When, as in this case, the plaintiff relies upon circumstantial evidence of misconduct, then the burden-shifting framework of *McDonnell Douglas* applies.  *McGrath-Malott*, 565 F. Supp. 2d at 670.  After the employee establishes a *prima facie* case, the burden shifts to the employer to rebut the inference of retaliation.  *McDonnell Douglas*, 411 U.S. at 802.  Although the employer's burden is not onerous, it must articulate "some legitimate, nondiscriminatory reason" for the adverse employment action.  *Id.*  Once the employer produces a legitimate, nondiscriminatory reason, the burden returns to the plaintiff to prove that the defendant's stated reason is pretextual.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  To that end, the employee must either show that the employer's explanation

is "'unworthy of credence' or . . . offer[ ] other forms of circumstantial evidence sufficiently probative of" the retaliation.  *Mereish v. Walker*, 359 F.3d 330, 332 (4th Cir. 2004); *see also McGrath-Malott*, 565 F. Supp. 2d at 670-71.

Looking to the elements of a *prima facie* case, it is undisputed that Roesinger suffered an adverse employment action, as she was terminated by Pohanka in November 2019.  The Plaintiffs asserts that it is also "undisputed" that she reasonably believed that she was being discriminated against on the basis of her gender and made a series of complaints to upper management where she outlined the basis of her beliefs.  (ECF No. 22-1 at 15.)  According to Roesinger, Pohanka does not challenge the fact that she made a protected complaint.  (*Id.*)  However, it is unclear to this Court whether Defendant Pohanka in fact disputes whether Roesinger engaged in protected activity.  In its Answer to Roesinger's Complaint, Pohanka asserted that "[t]he idea that Plaintiff's complaints, even if assumed to be true, were 'gender-based' has been created for litigation."  (ECF No. 6 ¶ 33.)  Bowen and White each stated in depositions that they did not understand the complaints brought to management to be related to discrimination on the basis of sex; they understood her to be complaining generally that her co-workers were treating her unfairly and passing her over for certain higher-paying jobs.  (*See* Bowen Dep. at 13:14-22, ECF No. 22-5; White Dep. at 17:20-18:16, ECF No. 22-8.)  Further, when Roesinger texted Fitzgerald about the alleged mistreatment, she did not mention that she thought the mistreatment was due to her being a woman.  (ECF No. 22-17.)

Viewing the facts in the light most favorable to the Plaintiff and assuming Roesinger did engage in protected activity, this Court turns to the next element of the *prima facie* case: whether Roesinger has shown a causal connection between her engaging in protected conduct

and her termination.  As the Plaintiff notes, under Title VII, this means that a plaintiff must show that his or her protected activity was the "but for" cause of the adverse employment action.  (ECF No. 22-1 at 14 (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).)  Although Title VII and MFEPA standards are generally the same, the standard for showing a "causal link" in the context of a retaliation claim is a unique instance in which the statutes' standards diverge: "in order to establish a causal link [under MFEPA], 'an employee must merely adduce evidence that their protected activity was a *motivating factor* in an employer's decision to subject them to an adverse employment action, not necessarily the controlling factor.'"  *Papanicolas v. Project Execution & Control Consulting, LLC*, 151 F. Supp. 3d 628, 631 (D. Md. 2015) (emphasis added) (quoting *Taylor v. Giant of Md.*, 33 A.3d 445, 463 (Md. 2011) (citation omitted)).  In this case, the difference between the two standards is immaterial.  Under the more stringent Title VII standard, the U.S. Court of Appeals for the Fourth Circuit has held that "proximity in time between the protected activity and the adverse employment action may be sufficient to establish the causation requirement" of the *prima facie* case.  *McGrath-Malott*, 565 F. Supp. 2d at 671 (citing *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998)).  The record in this case suggests that Roesinger made her alleged complaints regarding sexism to Fitzgerald and Bowen in mid-September of 2019.  Therefore, her termination in early November 2019 was less than two months after she lodged her complaints.  This is sufficient to at least present a genuine issue of material fact as to whether there was some connection between the termination and her alleged engagement in a protected activity under either the Title VII or the MFEPA standard.

Nevertheless, even if Roesinger can establish a *prima facie* case for retaliation, she cannot prevail under Count I because the Defendant has put forward a legitimate, nondiscriminatory reason for her termination, and Roesinger has not carried her burden of showing such reason is mere pretext for discrimination.   Defendant Pohanka asserts that Roesinger was not retaliated against: she left Bowen's office in direct violation of a reasonable request that she not leave a work meeting to call her boyfriend.  (ECF No. 17 at 11.)   According to the Defendant, Roesinger "knew or should have known the consequences of her decision" to leave and talk to her boyfriend instead of her boss.  (*Id.*)  Roesinger's termination paperwork clearly states she was fired for insubordination.  (ECF No. 22-21.)  Although Pohanka admits that there is a factual dispute as to the tone of the conversation between Bowen and Roesinger, the Defendant contends that "no request made by Mr. Bowen was objectively unreasonable," and that any dispute regarding the tone is immaterial.  (ECF No. 17 at 11.)

Other courts have held summary judgment in favor of defendant employers where the employees claiming retaliation were discharged after explicitly disobeying their superior's orders.  For example, in *Grady v. Cracker Barrel Old Country Store, Inc.*, a Cracker Barrel employee was caught eating a crouton off a plate in violation of the restaurant's policy that employees could not eat food without first paying for it.  No. 4:CV 06-558, 2007 WL 1959298, at *5 (M.D. Pa. July 2, 2007).  The employee was told by a supervisor, "don't let me see you stealing anymore food again or I will fire you."  *Id.*  It was then reported that the employee took a french fry off a customer's plate.  *Id.* at *6.  The employee was terminated.  *Id.*  The court denied the employee's retaliation claim finding that Cracker Barrel had put forward a

legitimate, nondiscriminatory reason for her termination—that the supervisor believed she had stolen food after previously being warned she should not do so.  *Id.* at *10.

Similarly, in *Martinez v. U.S. Bank*, a superior, Frederick, told an employee, Martinez, "If you don't do what I say, I'll fire you."  No. C12-0077, 2013 WL 6491470, at *1 (N.D. Iowa Dec. 10, 2013).  After Martinez made a mistake, potentially violating federal law, Frederick told him "not to talk to anyone else about" the issue until they had had a chance to speak with Human Resources.  *Id.* at *3.  Martinez nevertheless contacted someone else in the company about the issue.  *Id.*  Martinez was then terminated.  *Id.* at *4.  As the court explained, "[t]he question before the Court [was] not whether Frederick's decision to fire Martinez under the circumstances was wise, or even just."  *Id.* at *7 (citing *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012) ("The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgment made by employers, except to the extent that those judgments involve intentional discrimination.")).  The court then stated that its duty was to determine whether "the facts, viewed in the light most favorable to Martinez, [gave] rise to an inference that he was fired because he [was] Hispanic."  *Id.*  Unable to make that determination, the court held that Martinez had failed to state a *prima facie* case for retaliation, and that even if he could establish a *prima facie* case, Martinez would be unable to show that the nondiscriminatory reasons cited by the employer were mere pretext.  *Id.* at *7-*8.

Defendant Pohanka put forward a legitimate, nondiscriminatory reason for Roesinger's termination: she left Pohanka's Toyota dealership despite explicitly being told that she would be fired if she did not stay and complete a discussion with her superior.  This Court makes no

determination as to whether this termination was "wise, or even just." Under the *McDonnell-Douglas* framework, "the ultimate burden falls of [Roesinger] 'to produce evidence sufficient to create a genuine issue of material fact regarding whether [the employer's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination.'" *Id.* at *8 (citing *Guimaraes*, 674 F.3d at 973) (citation omitted)). Given there is no dispute that Roesinger and Bowen were engaged in a discussion and that Roesinger left the Pohanka premises after explicitly being told she needed to stay and participate in that conversation, this Court is satisfied that no reasonable jury could find that Pohanka's proffered reason of insubordination is a "mere pretext" for discrimination. Summary judgment shall be entered in favor of the Defendant on Count I.

## II.     Hostile Work Environment (Count II)

In Count II of the Complaint, Roesinger alleges hostile work environment in violation of Title VII and MFEPA. To establish a *prima facie* case for hostile work environment, a plaintiff must demonstrate that: "(1) the harassment was unwelcome; (2) the harassment was based on [her sex]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). In weighing whether conduct was sufficiently "severe or pervasive," courts consider the following factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993).

The Fourth Circuit has set a "high bar in order to satisfy the severe or pervasive test." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).  The Court has recognized that:

> [w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.  Some rolling with the punches is a fact of workplace life.  Thus, complaints premised on nothing more than "rude treatment by [coworkers]," "callous behavior by [one's] superiors," or "a routine difference of opinion and personality conflict with [one's] supervisor," are not actionable under Title VII.

*Id.* at 315-16 (quoting *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000)).

Roesinger makes several allegations with respect to the conditions at Pohanka.  Her allegations include that the male coworkers refused to interact with her, defaced the women's restroom, used offensive language such as "cunt," and were critical of her work.  Some of this alleged behavior is surely "rude," but it does not meet the "high bar" set by the Fourth Circuit.  As other courts have explained, "[a] cold shoulder can be hurtful, but it is not harassment." *Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006) (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000), overruled on other grounds by *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  "Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Brooks*, 229 F.3d at 929.  Further, "[w]orkplace interactions which are merely 'disrespectful, frustrating, critical, and unpleasant' do not create a hostile work environment." *Dangerfield v. Johns Hopkins Bayview Med. Ctr., Inc.*, No. JKB-19-155, 2019 WL

23

6130947, at *3 (D. Md. Nov. 19, 2019) (quoting *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2013), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (unpublished)).

Moreover, to establish a *prima facie* case for hostile work environment, the Plaintiff must show not only that the conduct was severe and pervasive, but also that the employer's conduct towards her was due to her sex. Specifically, Roesinger must show that "'but for' [her sex], [s]he would not have been the victim of alleged discrimination." *Causey*, 162 F.3d at 801. Roesinger has not provided evidence of this sort of "but for" causation. Meanwhile, the Defendant has provided statements from numerous colleagues who claim they avoided interacting with Roesinger due to her strange and difficult behavioral issues, not because she was a woman. (*See, e.g.*, Morton Decl. ¶ 3-4, ECF No. 17 at 26 ("When I came over to help, I questioned the way she was doing the repair. Ms. Roesinger became defensive and yelled at me . . . . I did my best to avoid her ever since."); Chilcoate Decl. ¶ 7, ECF No. 17 at 17 ("Speaking on my own behalf, and on behalf of my employees, it was very frustrating trying to help Ms. Roesinger. She genuinely did not seem to want our help.").)

Additionally, to whatever extent Roesinger's claims regarding manipulation of the work assignment system are applicable to her hostile work environment claim, again, she has not shown that any "mistreatment" was because of her sex. Roesinger makes numerous allegations that Pohanka employees gave her less lucrative jobs, which resulted in her being paid substantially less than her male counterparts. (ECF No. 1 ¶¶ 17-20.) In this lawsuit, the Defendant contends that any difference in pay or decisions not to give Roesinger certain repair jobs was due, not to her sex, but to her own decision to switch to flat rate payment and her inability to complete more complex repairs. (ECF Nos. 17, 23.)

It is undisputed that Roesinger moved from hourly pay to the flat rate pay system sometime in October of 2018.  Roesinger does not deny allegations made by the Defendant and its employees that this decision to switch to flat rate pay was a result of Roesinger's own request to make the transition.  She also does not dispute that she made the decision to switch despite warnings from Chilcoate and White that it was a bad idea.  (Chilcoate Decl. ¶ 2, ECF No. 17 at 16; White Decl. ¶ 9, ECF No. 17 at 19.)   Chilcoate explained that "[a]lmost all employees working under [his] supervision need[ed] a few years of experience before they [could] expect the flat rate pay system to be beneficial to them."  (Chilcoate Decl. ¶ 2, ECF No. 17 at 16.)  Nevertheless, Roesinger demanded to move to flat rate pay less than two years after beginning her career as a technician, and by making this voluntary change, she created a situation in which the type of jobs she was assigned determined the income she would receive. As the Defendant explains, "[b]ecause she went flat-rate, Ms. Roesinger needed more complex jobs."  (ECF No. 23 at 1.)

It is also undisputed that Roesinger was passed over for certain complex repairs. Fitzgerald explained to Roesinger that when she was working in the service department at Pohanka years prior, the shop did not follow an exact "round robin" assignment system, as certain technicians were more or less qualified for certain jobs—adjustments to the rotation had to be made.  (ECF No. 22-17.)  Roesinger acknowledged that she understood that was how the system generally worked.  (*Id.*)  Additionally, the undisputed declaration of service writer Williams further confirms that the assignment of repair jobs was based on a rotation, as well as the qualifications of the technicians.  (Williams Decl. ¶ 2, ECF No. 17 at 24.)  The Defendant asserts that Roesinger was simply "not ready or qualified" to do certain jobs safely,

that "she rushed things, without honing her skills," and "was ill-equipped to do more advanced, complicated jobs." (ECF No. 23 at 1-2.)  Numerous colleagues of Plaintiff Roesinger made statements regarding her tendency to break parts and failure to adequately make repairs. (*See* ECF No. 17 at 14-27.)  White, who observed her progress in class, stated that Roesinger had trouble grasping more complex concepts, as well as that she stopped attending classes regularly when she made the transition to flat rate pay. (White Decl. ¶¶ 5-6, 10, ECF No. 17 at 18.)  As Roesinger alleges, when she asked Burrs why she was being passed over for certain jobs, he explicitly told her it was because she messed things up. (Roesinger Dep. at 15:18-16:13, ECF No. 22-3.)  Roesinger testified that many at Pohanka "didn't trust [her] ability and what [she] was doing." (*Id.* at 14; *see also* ECF No. 23 at 3.)  According to Pohanka, that is undisputed and in fact explains the reason for any perceived "mistreatment."

Additionally, as noted above, Pohanka seems to question whether Roesinger herself actually thought the alleged mistreatment was the result of sexism.  When Roesinger contacted Fitzgerald about perceived mistreatment, she did not mention she thought others were mistreating her was because she was a woman. (ECF No. 22-17.)  Additionally, White and Bowen did not understand Roesinger's complaints to them regarding mistreatment related to job assignments to have anything to do with sex discrimination.  Each testified that that they understood Roesinger was unhappy and felt she was being mistreated, but each denied that they thought she was claiming the mistreatment was because of her sex. (*See* Bowen Dep. at 13:14-22, ECF No. 22-5; White Dep. at 17:20-18:16, ECF No. 22-8.)  As Roesinger herself alleges, Bowen responded to her complaint by, in part, offering to provide her with additional

instruction from White.  (Roesinger Dep. at 40:8-14, ECF No. 22-3.)  Improving her skills was offered as a solution to her problems.

Roesinger also concedes that she made mistakes.  (Roesinger Dep. at 66:4, ECF No. 22-3; Roesinger Decl. ¶ 12, ECF No. 22-4.)  She contends that other male technicians made mistakes as well, which she believes provides evidence that decisions to give or not give her certain assignments were based on her sex.  (Roesinger Decl. ¶ 12, ECF No. 22-4.)  However, Singh, one of the individuals Roesinger noted had made mistakes was not a flat rate employee—as White asserted, Singh started working for Pohanka around the same time as Roesinger but remained on hourly pay.  (White Dep. at 26:1-6, ECF No. 22-8.)  Further, this Court is unaware of any allegations that the other technicians responded to their mistakes in the same manner as Roesinger.  Numerous colleagues alleged that when they tried to assist Roesinger with her work, she was not receptive to their help and would become defensive when others offered suggestions, or would leave, cry, or hide when she received criticism or feedback.  (ECF No. 17 at 14-27.)  Chilcoate, her direct supervisor, stated that he told Roesinger she should come to him when she was having trouble with a repair, rather than continuing without assistance.  (Chilcoate Decl. ¶ 6, ECF No. 17 at 17.)  Yet, he alleges, she continued to refuse to ask for help and continued to break parts and otherwise mess up repairs.  (*Id.*)  Further, Roesinger herself stated that Coffin, who made a mistake that led to an engine needing to be replaced, paid for the replacement "out of pocket."  (Roesinger Dep. at 66:8-11, ECF No. 22-3.)  There are no allegations that Roesinger ever took such responsbility for her mistakes.  Williams noted that Roesinger instead "would try to blame everyone but herself for her mistakes" and in fact asked her to "upsell" the jobs when she made mistakes and in

order to pass any extra expenses along to the customers.  (Williams Decl. ¶¶ 3-4, ECF No. 17 at 24.)

Essentially, Roesinger has simply not shown that any mistreatment by her coworkers was based on her sex.  Even assuming she could show as such and satisfy the requirements for a *prima facie* case of hostile work environment, for the same reasons detailed in the foregoing paragraphs, Defendant Pohanka has provided a legitimate, nondiscriminatory reason for any difference in treatment: Roesinger's coworkers had concerns that she was inexperienced, irrational, difficult to work with, and routinely struggled with basic tasks.  (*See* Niall Decl. ¶¶ 7-10, ECF No. 17 at 14; Chilcoate Decl. ¶¶ 4-7, ECF No. 17 at 17; White Decl. ¶¶ 6, ECF No. 17 at 18; McGeehan Decl. ¶¶ 1, 3-4, ECF No. 17 at 22; Williams Decl. ¶¶ 3-4, ECF No. 17 at 24; Ebersole Decl. ¶¶ 2-4, ECF No. 17 at 25; Morton Decl. ¶¶ 2-4, ECF No. 17 at 26; Bradley Decl. ¶¶ 4, 7, ECF No. 17 at 27.)  No reasonable inference could be made from the facts in this record that such reason provided by Pohanka is a mere pretext for discrimination.  Summary judgment shall be entered in favor of the Defendant Pohanka on Count II.

### III.    Wrongful Termination (Count III)

In Count III, Roesinger asserts wrongful termination on the basis of her sex in violation of Title VII and MFEPA.  To establish a *prima facie* case of wrongful termination, the plaintiff must show that she: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was at the time performing her job duties at a level that met her employer's legitimate expectations; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class.  *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d

277, 285 (4th Cir. 2004).  The Defendant contends that Roesinger cannot establish a *prima facie* case for wrongful termination because she cannot show that she was "performing her job duties at a level that met her employer's legitimate expectations."  For the same reasons provided above, this Court would tend to agree.  Despite warnings that she was not yet qualified to work as a flat rate technician, Roesinger insisted on moving to flat rate pay.  (*See* Chilcoate Decl. ¶ 3, ECF No. 17 at 16; White Decl. ¶ 9, ECF No. 17 at 19.)  To succeed in that position, Roesinger needed to complete more complex, higher-paying repairs.  (Chilcoate Decl. ¶ 2, ECF No. 17 at 16; White Decl. ¶ 9, ECF No. 17 at 19.)  The Plaintiff has not provided any evidence that anyone besides Roesinger herself believed that she was qualified to start making such repairs.  The Defendants have also provided numerous declarations of coworkers who found Roesinger was difficult to work with and prone to irrational and extreme behavior, which Roesinger has not denied.

Even if Roesinger could show she was performing at a level that met Pohanka's expectations, again, Pohanka has legitimate, nondiscriminatory reasons for her dismissal. First, as noted in detail above, Roesinger was ultimately fired when she left the Pohanka premises after her supervisor explicitly told her she would be terminated if she left. Additionally, Pohanka has thoroughly detailed Roesinger's inexperience and concerning behavior she exhibited in interactions with other employees.  In *Alleman v. Louisiana Department of Economic Development*, the court the entered summary judgment in favor of the defendant where the defendant provided deficient work performance and difficulty maintaining appropriate working relationships with her co-workers as the reasons for an employee's dismissal.  698 F. Supp. 2d 644, 660 (M.D. La. 2010).  The court explained that the plaintiff

had not offered any evidence "to dispute the statements from [three] individuals that her work performance was deficient," nor had she "present[ed] any facts to dispute their statements that the plaintiff had difficulty interacting and maintaining appropriate relationships with her fellow employees." *Id.* The court held, in sum, that "there [was] no evidence to dispute the defendant's reasons for the plaintiff's termination. Nor [was] there any other evidence to support a reasonable inference that the defendant's conduct toward the plaintiff" was discriminatory. *Id.* In this case, Roesinger has not disputed that she made mistakes, nor that she had difficulty working with and interacting with her coworkers. These undisputed facts, combined with the undisputed facts related to her final meeting with Bowen that resulted in her termination, cannot give rise to an inference that Pohanka's nondiscriminatory reasons for dismissal are pretextual. Summary judgment shall be entered in favor of Defendant Pohanka on Count III.

## CONCLUSION

For the foregoing reasons, the Defendant Pohanka's Motion for Summary Judgment (ECF No. 17) is GRANTED, and summary judgment shall be ENTERED in favor of Defendant Pohanka on all counts of the Plaintiff's Complaint (ECF No. 1).

A Separate Order follows.

Dated: May 20, 2021

_____/s/_____

Richard D. Bennett
United States District Judge